CROSNER LEGAL, P.C.
Jennifer L. MacPherson (SBN 202021)
*jmacpherson@crosnerlegal.com*
Craig W. Straub (SBN 249032)
*craig@crosnerlegal.com*
Zachary M. Crosner (SBN 272295)
*zach@crosnerlegal.com*
9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429

*Attorneys for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERESA FLORES, individually, and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| ALBERTSONS COMPANIES, INC., a Delaware corporation, | |
| Defendant. | |

CROSNER LEGAL, P.C.

Plaintiff Teresa Flores ("Plaintiff") individually, and on behalf of all others similarly situated, and the general public, by and through undersigned counsel, hereby brings this action against Defendant Albertsons Companies, Inc. ("Defendant" or "Albertsons"), and upon information and belief and investigation of counsel, alleges as follows:

## NATURE OF THE ACTION

1. Defendant distributes, markets, and sells Signature Care Sensitive Skin Body Wash, Hypoallergenic (the "Product").

2. The front of the Product packaging prominently states that it is for "Sensitive Skin" and is "Hypoallergenic" and compares to "Dove® Sensitive Skin Nourishing Body Wash®" ("Dove Sensitive Skin Body Wash").[1]

3. Defendant's claim that the Product is hypoallergenic and formulated for sensitive skin and comparable to Dove Sensitive Skin Body Wash is false and misleading to reasonable consumers.

4. The Product is not formulated to be hypoallergenic or for sensitive skin because it contains Methylchloroisothiazolinone ("MCI") and Methylisothiazolinone ("MI") (referred together as "MCI/MI") and Cocamidopropyl Betaine ("CAPB"), common allergens.

5. Nor is it comparable to Dove Sensitive Skin Body Wash, which does not contain MCI/MI.[2]

6. Methylisothiazolinone was named allergen of the year in 2013 by the American Contact Dermatitis Society ("ACDS"), a group of 2,500 health care professionals focused on advancing care for allergic contact dermatitis ("ACD") and related inflammatory skin diseases.

7. MCI is multiple times more potent than MI.

8. Combined, MI and MCI, are two of the most predominant contact allergens found in personal care products.

---

[1] https://www.albertsons.com/shop/product-details.960457729.html?productId=960457729&CMPID=.
[2] https://www.dove.com/us/en/p/sensitive-body-wash.html/00011111122246.

CROSNER LEGAL, P.C.

9.      Studies show that as of 2018 eleven percent of the population in North America has been sensitized (developed an allergic response) to MCI/MI, due to its excessive use in industrial and consumer products and resulting overexposure.

10.     Defendant intends for consumers, including Plaintiff, to rely on its representations on the front label that the Product is for "Sensitive Skin" and is "Hypoallergenic" and is comparable to Dove Sensitive Skin Body Wash and reasonable consumers do so rely.

11.     Consumers lack the ability to test or independently ascertain the accuracy of a consumer product label or its potential to cause ACD at the point of sale. Reasonable consumers must and do rely on companies to honestly report the nature of a product's characteristics or ingredients.

12.     Plaintiff purchased the Product for her husband at a local Safeway in Stanislaus, California as a gift and because he has sensitive skin. Plaintiff was deceived by Defendant's unlawful and deceptive conduct and brings this action individually and on behalf of a California Class of consumers for violations of the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*., California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*., and a Multi-State Class for breach of express warranty.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which: (1) there are over 100 members in the proposed class; (2) members of the proposed class have a different citizenship from Defendant; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate, exclusive of interest and costs.

14.     This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the State of California, contracts to supply goods within the State of California, and supplies goods within the State of California. Defendant, on its own and through its agents, is responsible for the formulation, ingredients, manufacturing, labeling, marketing, and sale of the Product in California, specifically in this District. The marketing of

2

CLASS ACTION COMPLAINT

the Product, including the decision of what to include and not include on the labels, emanates from Defendant. Thus, Defendant has intentionally availed itself of the markets within California through its advertising, marketing, and sale of the Product to consumers in California, including Plaintiff.

15.    The Court has specific jurisdiction over Defendant as it has purposefully directed activities towards the forum state, Plaintiff's claims arise out of those activities, and it is reasonable for Defendant to defend this lawsuit because it has sold the Product in California. By distributing and selling the Product in California, Defendant has intentionally expressly aimed conduct at California which caused harm to Plaintiff and the Class which Defendant knows is likely to be suffered by Californians.

16.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendant engages in continuous and systematic business activities within the State of California. Venue is further proper pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District because Plaintiff purchased the Product within this District.  Venue is also proper in this District pursuant to Cal. Code Civ. Proc. § 395.5 because Defendant is doing business in this District, and the Product at issue was purchased in this District.

**PARTIES**

17.    Albertsons Companies, Inc. is an American grocery company with 2,271 retail stores across thirty-four states and the District of Columbia.[3]

18.    Albertsons is a Delaware corporation that is headquartered in Boise, Idaho. Albertsons is registered to do business in California.

---

[3]https://en.wikipedia.org/wiki/Albertsons; *Albertsons Companies Consolidates its Signature Family of Brands Under Signature SELECT®*, Albertsons Company News (May 31, 2023), *available at* https://www.albertsonscompanies.com/newsroom/press-releases/news-details/2023/Albertsons-Companies-Consolidates-its-Signature-Family-of-Brands-Under-Signature-SELECT/default.aspx.

CROSNER LEGAL, P.C.

19.    Through various mergers and acquisitions, Albertsons operates stores under the following banners: Albertsons, Safeway, and Vons, among others.[4]

20.    Albertsons manufactures, imports, sells, or distributes the Product in California, including Stanislaus County.

21.    Plaintiff is a resident of Stanislaus County. Plaintiff purchased the Product during the class period from a local Safeway as a Christmas gift for her husband because he has sensitive skin. The Product was purchased for personal, family, or household use.

22.    Prior to purchasing the Product Plaintiff read and relied on the representation made on the label on the front of the Product that it is for "Sensitive Skin" and is "Hypoallergenic" and is comparable to Dove Sensitive Skin Body Wash. Plaintiff tries to purchase hypoallergenic products for personal and household use that do not contain common allergens or skin irritants because her husband has sensitive skin.

23.    Plaintiff understood the representation that the Product was "Hypoallergenic" and for "Sensitive Skin" to mean the Product is specifically formulated to minimize the risk of allergic reactions by excluding ingredients that are known to cause an allergic reaction in a significant number of people. Defendant's inclusion of MCI/MI and CAPB, common allergens, directly contradicts this claim.

24.    After using this Product Plaintiff's husband experienced a rash on his stomach and neck. Plaintiff's spouse stopped using the Product after developing the rash.

25.    Plaintiff paid more for the Product than she would have had she known the representations and omissions were false and misleading or would not have purchased the Product. The value of the Product Plaintiff purchased was materially less than its value as represented by Defendant.

26.    As a result, Plaintiff suffered injury in fact when she spent money to purchase the Product she would not have purchased or would have paid less for absent Defendant's misconduct.

_____

[4] https://en.wikipedia.org/wiki/Albertsons.

CLASS ACTION COMPLAINT

CROSNER LEGAL, P.C.

CROSNER LEGAL, P.C.

27.     Plaintiff would purchase the Product again if its representations that the Product is hypoallergenic and formulated for sensitive skin and is comparable to Dove Sensitive Skin Body Wash are truthful.

### FACTUAL ALLEGATIONS

#### ALBERTSONS' SIGNATURE SELECT BRAND AND THE PRODUCT

28.     Albertsons offers its own line of products under several different brands, including the Signature Select brand.[5]  The Signature Select brand is "designed to build an emotional connection with customers."[6]

29.     In May 2023, Albertsons began rebranding its Signature Farms®, Signature Care™ and Signature Cafe® products under one master brand, Signature Select.[7]

30.     According to a survey commissioned by Albertsons Cos. consumer demand for private labels is growing with 93 percent of Americans embracing and expanding their purchases of store brands citing price, quality and availability as the main drivers of these purchases.[8]

31.     Signature Select is part of Albertsons' Own Brands portfolio, which includes O Organics, Lucerne®, Open Nature, Primo Taglio®, debi lilly design™, waterfront BISTRO®, Soleil®, Value Corner®, and Signature Care™.[9]

32.     Albertsons' Own Brands is a $16.5, plus billion dollar private label portfolio.[10]

33.     Signature Select is Albertsons' flagship brand and is the largest brand in its Own Brands portfolio.[11]

34.     Signature Select brand products are sold in-store at locations throughout the United States, including California, including at Albertsons, Safeway, Vons, and online.[12]

---

[5] *Ibid.*
[6] *Albertsons Companies Consolidates, supra* note 3.
[7] *Ibid.*
[8] *Ibid.*
[9] *Ibid.*
[10] *Our Own Brands*, Albertson Company News, *available at* https://www.albertsonscompanies.com/about-aci/our-own-brands/default.aspx.
[11] *Ibid.*
[12] *Supra* note 3.

CROSNER LEGAL, P.C.

35.     One of these products is the Signature Care Sensitive Skin Body Wash, Hypoallergenic.

36.     The front label of the Product represents to consumers that it is for "Sensitive Skin" and is "Hypoallergenic" and is comparable to Dove Sensitive Skin Body Wash.[13]

37.     This is not true because the Product contains MCI/MI and CAPB, common allergens.

38.     Methylisothiazolinone or MI was named allergen of the year in 2013, by the American Contact Dermatitis Society. The ACDS includes 2,500 health care professionals in the field of allergic contact dermatitis and related inflammatory skin diseases with a goal of advancing the care and understanding of dermatitis and allergy.[14]

39.     Methylchloroisothiazolinone or MCI is up to 30 times more potent than MI.[15]

40.     The Product is also not comparable to Dove Sensitive Skin Body Wash because that product does not contain MCI/MI.

### CONSUMER DEMAND FOR HYPOALLERGENIC PRODUCTS

41.     In 2024, the sensitive skin care market was estimated at $42 billion and is expected to grow to $61.48 billion by 2034.[16]

42.     According to Grand View Research, a market research and consulting company, this market growth is attributed to a significant rise in consumer awareness regarding skin sensitivities and the importance of using gentle and hypoallergenic products.[17]

---

[13]*Supra* note 1.
[14]American Contact Dermatitis Society (ACDS), Mission and Values, *available at* https://www.contactderm.org/about-acds/mission-and-values.
[15]Leiva-Salinas, M., *et al.*, *Update on Allergic Contact Dermatitis Due to Methylchloroisothiazolinone/Methylisothiazolinone and Methylisothiazolinone*, 105 Novelties in Dermatology 9 at pp.840-846 (Nov. 2014), *available at* https://www.sciencedirect.com/science/article/pii/S1578219014002479#.
[16] Nandi, Pradeep, *Global Sensitive Skin Care Product Market Overview*, Market Research Overview (Sept. 2024), *available at* https://www.marketresearchfuture.com/reports/sensitive-skin-care-product-market-25610.
[17] Grand View Research, *Sensitive Skin Care Products Market Size, Share & Trends Analysis Report*, Horizon Databook, *available at* https://www.grandviewresearch.com/industry-analysis/sensitive-skin-care-products-market-report#:~:text=.

43.    A primary driver of the sensitive skin care market is the increasing prevalence of sensitive skin conditions. Sensitive skin is characterized by a weakened skin barrier, which makes it more susceptible to irritation and inflammation.[18]

44.    Skin disorders such as acute contact dermatitis, which are linked to MCI/MI,[19] have a physical and psychological effect on those afflicted. Sensitive skin symptoms such as itching, stinging, burning and pain can result in sleep disorders, fatigue, stress, anxiety, depression, and lowered self-esteem.[20]

45.    Another major driver of the sensitive skin care market is the growing awareness of the importance of skin care among consumers. This includes a greater understanding of the importance of protecting the skin from the sun, moisturizing regularly, and using products that are appropriate for a person's skin type.[21]

46.    The State of Skin Sensitivity Report 2022, published by Aveeno, a global retailer of skin care and hair care products, found that 71% of individuals have sensitive skin.[22] And, "the number of people who self-declare they have sensitive skin has increased a whopping 55% in just two decades."[23] This coincides with other studies that find approximately half of Americans identify as having sensitive skin.[24]

47.    Those who suffer from a skin allergy seek hypoallergenic products to avoid an outbreak. Consumers who do not suffer from skin allergies seek hypoallergenic products to avoid developing a skin allergy.

---

[18] Nandi, Pradeep, *supra note 16.*
[19] Leiva-Salines, *supra note 15.*
[20] Farage, Miranda A., *Psychological Aspects of Sensitive Skin: A Vicious Cycle*, 9 Cosmetics 4 at p.78 (July 29, 2022), *available at* https://www.mdpi.com/2079-9284/9/4/78.
[21] Nandi, *supra* note 16.
[22] Aveeno, *The State of Skin Sensitivity*, *available at* https://www.aveeno.com/state-of-skin-sensitivity.
[23] *Ibid.*
[24] Misery, Laurent, *et al.*, *Sensitive skin in the American population: prevalence, clinical data, and role of the dermatologist*, 50 Int. J. Dermatol 8 at pp.961-67 (Aug. 2011), *available at* https://pubmed.ncbi.nlm.nih.gov/21781068/; Jiang, Chuanxia, *et al.*, *Sensitive skin syndrome: Research progress on mechanisms and applications*, 1 Journal of Dermatologic Science and Cosmetic Technology 2 (June 2024), *available at* https://www.sciencedirect.com/science/article/pii/S2950306X2400013X.

7

CROSNER LEGAL, P.C.

48.     The above factors have resulted in a strong consumer demand for products that are "hypoallergenic" meaning they are specifically formulated to minimize the risk of allergic reactions by excluding ingredients that are known to cause an allergic reaction in a significant number of people. Consumers are increasingly seeking products with cleaner ingredient lists, free from harsh chemicals, fragrances, and artificial additives that can trigger adverse reactions.[25]

**DEFENDANT CAPITALIZES ON THIS TREND BY MARKETING THE PRODUCT AS "HYPOALLERGENIC" AND FOR "SENSITIVE SKIN"**

49.     Recognizing this trend and to appeal to the growing market of consumers seeking products that are formulated for sensitive skin and are hypoallergenic, Defendant labels the Product as "Hypoallergenic" and for "Sensitive Skin." This appears on the front label of every bottle of the Product. A picture of the front of the Product is below:[26]



---

[25] Mathews, Ken, *Global Sensitive Skin Care Products Market– Global Industry Size, Share, Trends, Competition, Opportunity, and Forecast, 2018-2028F, available at* https://www.techsciresearch.com/news/10590-sensitive-skin-care-products-market.html.
[26]*Supra* note 1.

CLASS ACTION COMPLAINT

CROSNER LEGAL, P.C.

1    50.    The ingredients for this Product are below and show that it contains MCI/MI.[27]

2

3    INGREDIENTS: WATER, COCAMIDOPROPYL BETAINE,
SODIUM HYDROXYPROPYL STARCH PHOSPHATE, LAURIC
ACID, SODIUM LAUROYL GLYCINATE, SODIUM LAUROYL

4    ISETHIONATE, HYDROGENATED SOYBEAN OIL, GLYCINE
SOJA (SOYBEAN) OIL, SODIUM CHLORIDE, GLYCERIN,

5    GUAR HYDROXYPROPYLTRIMONIUM CHLORIDE, STEARIC

6    ACID, CITRIC ACID, FRAGRANCE, SODIUM HYDROXIDE,
BHT, TETRASODIUM EDTA, METHYLCHLOROISOTHIAZOLI-

7    NONE, METHYLISOTHIAZOLINONE

8    51.    The Product also contains Cocamidopropyl Betaine, which was named allergen

9    of the year in 2004 by the ACDS due to its increasing rate of sensitization among the general

10    population (3 to 7.2%).[28]

11    52.    The Product is sold at a premium compared to similar products not labeled as

12    hypoallergenic or for sensitive skin. Albertsons sells 22 fluid ounces of the Product for $6.89

13    online, amounting to 31 cents per fluid ounce.[29]

14    53.    By comparison, 22 fluid ounces of St. Ives Oat & Shea Butter Body Wash,

15    which makes no claim that it is hypoallergenic or for sensitive skin sells online at Albertson's

16    for $4.99 or 23 cents per fluid ounce, pictured below.[30]

17    / / /

18    / / /

19    / / /

20    / / /

21    / / /

22

---

23    [27]*Ibid.*

24    [28] Jacob, Sharon E. and Sadegh Amini, *Cocamidopropyl betaine*, 19 Dermatitis 3 at pp.157-60
(May/June            2008),            *available            at*

25    https://pubmed.ncbi.nlm.nih.gov/18627690/#:~:text=Cocamidopropyl%20betaine%20(CAPB)
%20is%20an,antiseptics%2C%20and%20gynecologic%20and%20anal;    *Review    ACDS'*

26    *Allergen of the Year 2000-2015*, Dermatologist (Nov. 2014), *available at*
https://www.hmpglobaleearningnetwork.com/site/thederm/site/cathlab/event/review-acds-

27    allergen-od-year-2000-2015.
[29]*Supra* note 1 (as of Aug. 20, 2025).

28    [30]https://www.albertsons.com/shop/product-details.970013559.html?productId=970013559 (as
of Aug. 20, 2025).

Crosner Legal, P.C.

9



**DEFENDANT'S "HYPOALLERGENIC" AND "SENSITIVE SKIN" AND "COMPARE TO" CLAIMS**

**ARE MISLEADING**

*MEANING OF HYPOALLERGENIC*

54.     As it relates to cosmetics, but equally applicable here, the FDA advises there are no Federal standards or definitions that govern the use of the term "hypoallergenic" or "for sensitive skin" rather "[t]he term means whatever a particular company wants it to mean."[31]

/ / /

/ / /

---

[31]U.S. FDA, *"Hypoallergenic" Cosmetics* (Feb. 25, 2022), *available at* https://www.fda.gov/cosmetics/cosmetics-labeling-claims/hypoallergenic-cosmetics#:~:text=Hypoallergenic.

CROSNER LEGAL, P.C.

55.    The FDA, however, describes "hypoallergenic" in the context of cosmetics to mean "products that manufacturers claim produce fewer allergic reactions than other cosmetic products."[32]

56.    Similarly, Dictionary.com defines hypoallergenic as "designed to reduce or minimize the possibility of an allergic response, as by containing relatively few or no potentially irritating substances."[33]

57.    Merriam-Webster defines hypoallergenic as "having little likelihood of causing an allergic response."[34]

58.    Thus, reasonable consumers believe and expect that a hypoallergenic product is specifically formulated to minimize the risk of allergic reactions by excluding ingredients that are known to cause an allergic reaction in a significant number of people.

59.    The FDA acknowledges that "[c]onsumers with hypersensitive skin, and even those with 'normal' skin, may be led to believe that [] [hypoallergenic] products will be gentler to their skin than non-hypoallergenic cosmetics."[35] It explains, "[f]or many years, companies have been producing products which they claim are 'hypoallergenic' or 'safe for sensitive skin' or 'allergy tested.' These statements imply that the products making the claims are less likely to cause allergic reactions than competing products. . . ."[36]

60.    The FDA also acknowledges that "[t]he term 'hypoallergenic' may have considerable market value in promoting cosmetic products to consumers on a retail basis[.]"[37]

61.    Reasonable consumers will not have the time, ability or knowledge to scrutinize each ingredient in Defendant's Product at the point-of-sale when deciding to purchase the Product based on Defendant's deceptive and misleading claim that it is "Hypoallergenic" and for "Sensitive Skin."

---

[32] *Ibid.*
[33] https://www.dictionary.com/browse/hypoallergenic.
[34] https://www.merriam-webster.com/dictionary/hypoallergenic.
[35] U.S. FDA, *"Hypoallergenic" Cosmetics, supra* note 31.
[36] *Ibid.*
[37] *Ibid.*

CLASS ACTION COMPLAINT

1    62.    Even if consumers scrutinized Defendant's ingredient list, a reasonable consumer

2    would not know that the chemical compound MCI/MI is not hypoallergenic or for sensitive

3    skin. This would require investigation beyond the grocery store and knowledge of chemistry

4    beyond that of the average reasonable consumer. Reasonable consumers must and do rely on

5    companies like Defendant to honestly report the nature of a product's ingredients.

6    ***PRODUCTS WITH MCI/MI AND CAPB ARE NOT HYPOALLERGENIC AND ARE NOT***

7    ***FORMULATED FOR SENSITIVE SKIN***

8    63.    Methylisothiazolinone (MI) and Methylchloroisothiazolinone (MCI) are used as

9    preservatives in liquid cosmetics, personal care products, and household detergents to inhibit

10    the growth of bacteria, yeast and fungi.[38] Often they are used in combination (MCI/MI), or MI

11    is used alone.

12    64.    The FDA compiled a list of common allergens found in cosmetic products "that

13    cause most allergic reactions from the use of cosmetic products," and includes among them

14    MCI and MI.[39]

15    65.    Methylisothiazolinone is a well-known contact allergen.[40] In 2013, it was named

16    allergen of the year by the American Contact Dermatitis Society because of its increased use in

17    consumer products and the increasing incidences of contact allergy reported to be associated

18    with exposure to MI.[41]

19    66.    MCI is more allergenic than MI.[42] Studies show MCI is 30 times more potent

20    than MI.[43]

21

22    [38]Rodrigues-Barata, Ana Rita, *et al.*, *Methylisothiazolinone and Methylchloroisothiazolinone:*
*New Insights*, 2 EMJ Dermatol at pp.101-105 (2014), *available at*
23    https://www.emjreviews.com/wp-content/uploads/2018/02/Methylisothiazolinone-and-
Methylchloroisothiazolinone-New-Insights.pdf.

24    [39]U.S. FDA, *Allergens in Cosmetics* (Feb. 25, 2022), *available at*
https://www.fda.gov/cosmetics/cosmetic-ingredients/allergens-cosmetics.

25    [40]Rodrigues-Barata, *Methylisothiazolinone and Methylchloroisothiazolinone: New Insights,*
*supra* note 38.

26    [41]Yu, Sherry, H., *et al.*, *Patch Testing for Methylisothiazolinone and*
*Methylchloroisothiazolinone-Methylisothiazolinone Contact Allergy*, 152 JAMA Dermatol. 1 at
27    pp.67-72 (2016), *available at*
https://jamanetwork.com/journals/jamadermatology/fullarticle/2467989.

28    [42] Leiva-Salinas, M., *supra* note 15.
[43] *Ibid.*; Rodrigues-Barata, *supra* note 38.

12

CROSNER LEGAL, P.C.

67.     MI and MCI/MI are a frequent cause of allergic contact dermatitis, which presents as an itchy red rash on the skin.[44]

68.     In 2022, contact dermatitis was the fifth most prevalent skin disease in the US, exceeding $1.5 billion in direct annual medical costs.[45]

69.     Consumers who are allergic to MCI/MI are unlikely to know unless they undergo testing.

### OVEREXPOSURE TO MCI/MI AND MI HAS CREATED AN EPIDEMIC OF SENSITIVITY TO THESE ALLERGENS IN POPULATIONS ACROSS THE GLOBE

70.     Since introduced the use of MI and MCI/MI has increased substantially.[46] Corresponding to their increased use in consumer products, there has been a significant increase in contact allergy to MI and MCI/MI across the globe, including North America.

71.     The combination MCI/MI was permitted in cosmetic products in 1986.[47] During the following decade, the frequency of allergic contact dermatitis to MCI/MI became what has been described as epidemic.[48]

72.     Since it was originally (and erroneously)[49] thought that the allergenicity of the MCI/MI combination lay with MCI, in 2005, use of MI alone was authorized at high concentrations in cosmetic products, representing a greater than 25-fold increase in MI

---

[44]Rios Scherrer, Maria Antonieta, *et al.*, *Contact dermatitis to methylisothiazolinone*, 90 An Bras Dermatol. 6 at pp.912–14 (Nov-Dec 2015), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC4689087/; Reeder, Margo J. M.D., *et al.*, *Trends in the Prevalence of Methylchloroisothiazolinone/Methylisothiazolinone Contact Allergy in North America and Europe*, 159 JAMA Dermatol. 3 at pp.267-74 (2023), *available at* https://jamanetwork.com/journals/jamadermatology/fullarticle/2800343; Gordon, Lynne, MD, *Methylisothiazolinone allergy*, Dermnet (Jan. 31, 2016), *available at* https://dermnetnz.org/topics/methylisothiazolinone-allergy#:~:text=People%20diagnosed.

[45] Young, Peter, MPAS, *et al.*, *Prevalence of Contact Allergens in Natural Skin Care Products From US Commercial Retailers*, 158 JAMA Dermatology 11 at pp.1323-25 (Sept. 14, 2022), *available at* https://jamanetwork.com/journals/jamadermatology/fullarticle/2795927.

[46] Lidén, Carola and Ian R. White, *Increasing non-cosmetic exposure and sensitization to isothiazolinones require action for prevention: Review*, 90 Contact Dermatitis 5 (March 12, 2024), *available at* https://onlinelibrary.wiley.com/doi/10.1111/cod.14523.

[47] *Ibid.*

[48] *Ibid.*

[49] Reeder, Margo J., *supra* note 44; Leiva-Salinas, M., *supra* note 15.

13

exposure for consumers.[50]

73.    Because MI is less effective as a biocide than MCI it must be used at higher concentrations.[51] Soon the first cases of MI-induced allergic contact dermatitis began to emerge,[52] as did a global increase in prevalence of contact allergy to isothiazolinones.[53]

74.    Studies confirm that MI and MCI/MI are highly allergenic due in large part to their increased use in consumer products that has resulted in what has been described as an "epidemic" of sensitivity in populations across the globe.

75.    Authors of a 2024 study explain, "[i]t is well known that the preservatives methylchloroisothiazolinone/methylisothiazolinone [] and methylisothiazolinone [] have resulted in global epidemics of contact allergy and associated allergic contact dermatitis."[54]

76.    A 2023 study found that in North America during the period 2009-2018, MCI/MI positivity increased from 2.5% in 2009/2010 to 10.8% in 2017/2018, and MI positivity increased from 10.8% in 2013/2014 to 15.0% in 2017/2018.[55] This study patch tested 226,161 participants in North America and Europe for an allergy to MCI/MI, and 118,779 participants for an allergy to MI.

77.    Patch testing is an important diagnostic tool for the assessment of ACD. Every few years the North American Contact Dermatitis Group (NACDG) tests patients who have suspected allergic contact dermatitis with a broad series of screening allergens and publishes periodic reports of its data.[56] NACDG patch test studies show that the allergenic effect of MCI/MI and MI among the population in North America is increasing.

---

[50] Reeder, Margo J., *supra* note 44; Schlichte, Megan J. and Rajani Katta, *Methylisothiazolinone: An Emergent Allergen in Common Pediatric Skin Care Products*, Dermatol Res Pract. (Aug. 27, 2014),                                    *available*                                    *at* https://pmc.ncbi.nlm.nih.gov/articles/PMC4197884/#:~:text=Recent%20reports%20of%20allergic%20contact,allergic%20contact%20dermatitis%20%5B5%5D.
[51] Leiva-Salinas, M., *supra* note 15.
[52] *Ibid*.
[53] Reeder, Margo J., *supra* note 44.
[54] Lidén, Carola, *supra* note 46.
[55] Reeder, Margo J., *supra* note 44.
[56] Zug, Kathryn A., *et al.*, *Patch-test results of the North American Contact Dermatitis Group 2005-2006*, 20 Dermatitis 3 at pp.149-160 (May-June 2009), *available* *at* https://pubmed.ncbi.nlm.nih.gov/19470301/.

CROSNER LEGAL, P.C.

78. The NACDG Patch Test Results for 2007 to 2008 found a "significant increase" in positivity rates to methylchloroisothiazolinone/methylisothiazolinone (3.6%) out of the 5,085 patients tested.[57]

79. The NACDG patch test results for 2011-2012 found, "[a]s compared with previous reporting periods (2009-2010 and 2000-2010), positive reaction rates statistically increased" for methylchloroisothiazolinone/methylisothiazolinone to 5.0% out of 4,238 patients tested.[58] This study concluded that "these data document the beginning of the epidemic of sensitivity to methylisothiazolinones in North America, which has been well documented in Europe."[59]

80. The NACDG Patch Test Results for 2013-2014 found that compared with the previous reporting periods (2011-2012 and 2001-2012, including at least three 2-year cycles), positive reaction rates statistically increased for methylchloroisothiazolinone/methylisothiazolinone (6.4%).[60] This study also found that "[m]ethylisothiazolinone, . . ., had the third highest positive reaction rate of allergens tested (10.9%)" out of the 4,871 patients tested.[61] This study concluded that "[t]hese results confirm that the epidemic of sensitivity to methylisothiazolinone previously documented in Europe is also occurring in North America."[62]

81. The NACDG Patch Test Results for 2015-2016 found that "[m]ethylisothiazolinone, . . ., had the second highest positive reaction rate of allergens tested

---

[57] Fransway, Anthony F., *et al.*, *North American Contact Dermatitis Group patch test results for 2007-2008*, 24 Dermatitis 1 at pp.10-21 (Jan-Feb 2013), *available at* https://pubmed.ncbi.nlm.nih.gov/23340394/.
[58] Warshaw, Erin M., *et al.*, *North American contact dermatitis group patch test results: 2011-2012*, 26 Dermatitis 1 at pp.49-59 (Jan/Feb 2015), *available at* https://pubmed.ncbi.nlm.nih.gov/25581671/.
[59] *Ibid.*
[60] DeKoven, Joel G., *et al.*, *North American Contact Dermatitis Group Patch Test Results 2013-2014*, 28 Dermatitis 1 at pp.33-46 (Jan/Feb 2017), *available at* https://pubmed.ncbi.nlm.nih.gov/27775967/.
[61] *Ibid.*
[62] *Ibid.*

CROSNER LEGAL, P.C.

CROSNER LEGAL, P.C.

(13.4%)" out of the 5,597 patients tested.[63] The study concluded "[t]hese results confirm that the epidemic of sensitivity to methylisothiazolinone has continued in North America."[64]

82.     The NACDG Patch Test Results for 2017-2018 found that "methylisothiazolinone [] (15.3%) and methylchloroisothiazolinone/methylisothiazolinone [] [()11.0%)" were the second most common allergen detected out of the 4,947 patients tested.[65] The study concluded "[m]ethylisothiazolinone continues to be a significant allergen in North America."[66]

83.     The NACDG Patch Test Results for 2019-2020 found that "methylisothiazolinone (MI) (13.8%)," was one of the most common allergens out of the 4,121 patients tested.[67]

84.     As described above, as of 2018 almost 11 percent of the population in North America had been sensitized to MCI/MI, described as an "epidemic" level.

85.     The epidemic of sensitivity to MCI/MI and MI among the consuming public can be attributed to their overuse combined with their being strong sensitizers.[68] Sensitizers are chemicals with the potential to become allergens through repeated exposure.

86.     Skin sensitization develops in two stages: induction and elicitation. The induction phase involves the initial exposure of a non-allergenic individual to a chemical sensitizer. During induction, the body develops a sensitivity to the allergen. Elicitation is the subsequent reaction that occurs upon re-exposure to the same allergen, triggering an allergic response such as allergic contact dermatitis.

---

[63] DeKoven, Joel G., *et al.*, *North American Contact Dermatitis Group Patch Test Results: 2015-2016*, 29 Dermatitis 6 at pp.297-309 (Nov/Dec 2018), *available at* https://pubmed.ncbi.nlm.nih.gov/30422882/.
[64] *Ibid*.
[65] DeKoven, Joel G., *et al.*, *North American Contact Dermatitis Group Patch Test Results: 2017-2018*, 32 Dermatitis 2 at pp.111-123 (March/April 2021), *available at* https://pubmed.ncbi.nlm.nih.gov/33970567/.
[66] *Ibid*.
[67] DeKoven, Joel G., *et al.*, *North American Contact Dermatitis Group Patch Test Results: 2019-2020*, 34 Dermatitis 2 at pp.90-104 (March/April 2023), *available at* https://pubmed.ncbi.nlm.nih.gov/36917520/.
[68] Lidén, Carola, *supra* note 46; Leiva-Salinas, M., *supra* note 15.

16

CROSNER LEGAL. P.C.

87.    MCI/MI is identified as a Category 1A sensitizer under the Globally Harmonized System of Classification and Labelling of Chemicals ("GHS"), meaning it has a high frequency of sensitizing occurrence/high potency.[69] The GHS provides internationally harmonized hazard classification and labeling of hazardous chemical substances and mixtures of substances, for protection of health and the environment and to facilitate trade.[70] Classification of substances for skin sensitization are based on sensitizing potency as shown by human and/or animal data.[71] A Category 1A sensitizer under the GHS has been determined to induce sensitization at concentrations less than 0.1%.[72]

88.    In the United States, the maximum concentration of MCI/MI (as a 3:1 ratio) allowed for use in rinse-off products like a body wash is 15 ppm because at this amount it is generally considered not to induce sensitization.

89.    The specific amount determined to be non-sensitizing for any given product, however, depends on several factors including the frequency, site, and duration of exposure.[73] The Product, a body wash that contains MCI/MI, that is intended to be used during regular showers over the entire body, has a high frequency and exposure rate.

///

///

---

[69] Reinke, Emily N., *et al.*, *The skin allergy risk assessment-integrated chemical environment (SARA-ICE) defined approach to derive points of departure for skin sensitization*, 8 Current Research in Toxicology 2025 at Table 7, *available at* https://www.sciencedirect.com/science/article/pii/S2666027X24000586#:~:text=Binary; Molinari, Francesco, *et al.*, *Biocide mixture (CMIT/MIT) induces neurotoxicity through the upregulation of the MAPKs signaling pathways*, 134 Journal of Neurophysiology 1 at pp.183-192 (June 11, 2025), *available at* https://journals.physiology.org/doi/full/10.1152/jn.00104.2025#:~:text=CMIT%2FMIT%20was%20categorized%20as,risk%20assessment%20of%20these%20substances.
[70] Lidén, Carola, *et al.*, *Preservatives in non-cosmetic products: Increasing human exposure requires action for protection of health*, 87 Dermatitis 3 (July 2022), *available at* https://onlinelibrary.wiley.com/doi/full/10.1111/cod.14181.
[71] *Ibid.*
[72] *Globally Harmonized System and Classification of Labelling of Chemicals (GHS)*, United Nations, 10th Rev. Ed. at p.178, Table 3.4.5 (2023), *available at* https://unece.org/sites/default/files/2023-07/GHS%20Rev10e.pdf.
[73] Cosmetic Ingredient Review, *Amended Safety Assessment of Methylchloroisothiazolinone and Methylisothiazolinone as Used in Cosmetics*, Final Amended Report at pp.7-8 (Feb. 25, 2020), *available at* https://www.cir-safety.org/sites/default/files/mcimi122019FAR.pdf.

17

90.    Once sensitized all that is needed to elicit or trigger a reaction is contact with a low concentration of the causative chemical.[74] Zachariae, *et al.* ("*Zachariae*") found as little as 2 ppm (.0002%) of MCI/MI elicited a reaction in 28% of subjects previously sensitized to MCI/MI and elicited a positive reaction in 56% of subjects at 7.5 ppm (.00075).[75]

91.    The Product, which contains MCI/MI, a known sensitizer, to which almost 11 percent of the population in North America has already been sensitized, for whom even trace amounts may elicit an allergic reaction such as ACD is not hypoallergenic or formulated for sensitive skin.

**REASONABLE CONSUMERS ARE DECEIVED BY DEFENDANT'S MISREPRESENTATION AND OMISSION**

92.    Marketing the Product as "Hypoallergenic" and for "Sensitive Skin" and comparable to Dove Sensitive Skin Body Wash is misleading to reasonable consumers because it contains common allergens: MCI/MI and CAPB.

93.    When purchasing the Product, Plaintiff sought a product that was hypoallergenic and for sensitive skin as represented by Defendant on the front label of the Product.

94.    Plaintiff read and relied on Defendant's false and misleading claim that the Product was "Hypoallergenic" and for "Sensitive Skin" and comparable to Dove Sensitive Skin Body Wash.

95.    Reasonable consumers, including Plaintiff, viewing the Product label, which represents that it is "Hypoallergenic" and for "Sensitive Skin" expect the Product is specifically formulated to minimize the risk of allergic reactions by excluding ingredients that are known to cause an allergic reaction in a significant number of people.

---

[74] Castanedo Tardan, Mari Paz, M.D., *Allergic Contact Dermatitis*, University of Michigan Medicine, *available at* https://medicine.umich.edu/sites/default/files/content/downloads/Castanedo%20Tardan%20MariPaz%20October%20%205%20Plenary-Allergic%20Contact%20Dermatitis_0.pdf.

[75] Zachariae, Claus, *et al.*, *An evaluation of dose/unit area and time as key factors influencing the elicitation capacity of methylchloroisothiazolinone/methylisothiazolinone (MCI/MI) in MCI/MI-allergic patients*, 55 Contact Dermatitis at pp.160-66 (2006), *available at* https://www.epa.gov/sites/default/files/2017-01/documents/50035302_der_roat_study_zachariae.pdf.

CROSNER LEGAL, P.C.

96.    MCI/MI and CAPB are common allergens and thus the Product is not hypoallergenic or formulated for sensitive skin. Nor is it comparable to Dove Sensitive Skin Body Wash, which does not contain MCI/MI.

**PLAINTIFF AND PUTATIVE CLASS MEMBERS SUFFERED ECONOMIC INJURY**

97.    Plaintiff and putative Class members suffered economic injury as a result of Defendant's actions. Plaintiff and putative Class members spent money that, absent Defendant's actions, they would not have spent.

98.    Plaintiff and Class members would not have purchased or would have paid less for the Product if they knew it contained common allergens: MCI/MI and CAPB.  MCI/MI has been identified as a common allergen, including by the FDA, whose sensitivity across the population in North America has reached epidemic proportions.

99.    The Products were worth less than what Plaintiff paid, and she would not have paid as much absent Defendant's false and misleading statements and omissions.

100.    The Product is sold at a premium compared to similar products not labeled as hypoallergenic or for sensitive skin. Albertsons sells 22 fluid ounces of the Product for $5.99 online, amounting to 27 cents per fluid ounce.[76]

101.    Similar products are available for purchase that cost less. By comparison, Albertsons sells 22 fluid ounces of St. Ives Oat & Shea Butter Body Wash, which makes no claim that it is hypoallergenic or for sensitive skin, for $4.99 online or 23 cents per fluid ounce.[77]

102.    Plaintiff would like to, and would, purchase the Product again in the future if the representations are truthful. As a result of Defendant's ongoing misrepresentations and omissions, Plaintiff is unable to rely on the Product's labeling when deciding in the future whether to purchase the Product or any similar Signature Select/Care products labeled as hypoallergenic and/or for sensitive skin. Plaintiff is likely to be repeatedly misled by Defendant's conduct, unless and until it ensures that the Product's marketing is accurate.

---

[76]*Supra* note 1.
[77] *Supra* note 30.

CROSNER LEGAL, P.C.

103.    Accordingly, Plaintiff brings this action individually and on behalf of other similarly situated consumers to halt the dissemination of Defendant's deceptive advertising message, correct the deceptive perception it has created in the minds of consumers, and obtain redress for those who have purchased the Product.

104.    As a consequence of Defendant's deceptive labeling and material omissions, Plaintiff alleges Defendant has violated and is violating the CLRA, UCL and has breached express warranties.

**NO ADEQUATE REMEDY AT LAW**

105.    Plaintiff and members of the Class are entitled to equitable relief (which may be plead in the alternative) as no adequate remedy at law exists. The legal remedies are inadequate because they are not equally prompt, certain, or efficient as equitable relief.

106.    The statutes of limitations for the causes of action pled herein vary. Class members who purchased the Product more than three years prior to the filing of the Complaint will be barred from recovery if equitable relief were not permitted under the UCL.

107.    The scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. It includes Defendant's overall unfair marketing scheme to promote and brand the Product, across a multitude of media platforms, including the Product label, packaging, and online descriptions, over a long period of time, in order to gain an unfair advantage over competitor products. Plaintiff and Class members may also be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (e.g., the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct).

108.    Further, injunctive relief is appropriate on behalf of Plaintiff and members of the Class because Defendant continues to misrepresent the Product as being "Hypoallergenic" and for "Sensitive Skin" and comparable to Dove Sensitive Skin Body Wash despite that it contains MCI/MI a common allergen that has reached epidemic proportions among consumers in the United States.

CROSNER LEGAL, P.C.

20

109.    Injunctive relief is necessary to prevent Defendant from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Further, a public injunction is available under the UCL, and damages will not adequately benefit the general public in a manner equivalent to an injunction.

## CLASS ACTION ALLEGATIONS

110.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself and a California Class and Multi-State Class, defined as follows:

**The "California Class":**

All persons who purchased the Product in California for personal, household or family use, within the applicable statute of limitations, until the date class notice is disseminated.

**The "Multi-State Breach of Warranty Class":**

All persons who purchased the Product for personal, household or family use in states with express warranty laws that are substantially similar to California's warranty law,[78] within the applicable statute of limitations, until the date class notice is disseminated.

111.    The "California Class" and "Multi-State Breach of Warranty Class" are referred to together as the "Class." Excluded from the Class are: (i) Defendant and its officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; and (iii) judicial officers and their immediate family members and associated court staff assigned to the case.

---

[78] Plaintiff preliminarily asserts the following states have express warranty laws that are substantially similar to California's breach of express warranty law: Alaska, Arizona, Arkansas, Colorado, Connecticut, Delaware, District of Columbia, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Maine, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, or Wyoming.

CROSNER LEGAL, P.C.

112.    Plaintiff reserves the right to amend or otherwise alter the Class definition presented to the Court at the appropriate time, or to propose or eliminate subclasses, in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

113.    Certification of the Class is appropriate because Plaintiff can prove the elements of the claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

114.    <u>Numerosity</u>: Class members are so numerous that joinder of all members is impracticable. Plaintiff believes there are thousands of consumers who are Class members described above who have been damaged by Defendant's deceptive and misleading practices. According to Albertsons its Signature brand generates at least $8.9 billion in sales annually spread across over 9,000 products.[79]

115.    <u>Commonality</u>: There is a well-defined community of interest in the common questions of law and fact affecting all Class members. The questions of law and fact common to the Class which predominate over any questions that may affect individual Class members include, but are not limited to:

a.    Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Product;

b.    Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Product;

c.    Whether Defendant made misrepresentations and/or failed to disclose material facts concerning the Product that were likely to deceive the public;

d.    Whether the representations that the Product is "Hypoallergenic" and for "Sensitive Skin" and is comparable to Dove Sensitive Skin Body Wash are false, deceptive, misleading, or unfair;

---

[79] Redman, Russell, *Albertsons to bring Signature brand family under one name*, Supermarket News (May 30, 2023), *available at* https://www.supermarketnews.com/independents-regional-grocers/albertsons-to-bring-signature-brand-family-under-one-name.

22

CROSNER LEGAL, P.C.

e.    Whether Defendant committed a breach of express warranty in its labeling the Product "Hypoallergenic" and for "Sensitive Skin" and comparable to Dove Sensitive Skin Body Wash;

f.    Whether Plaintiff and the Class are entitled to injunctive relief;

g.    Whether Plaintiff and the Class are entitled to money damages and/or restitution under the same causes of action as the other Class members.

116.    <u>Typicality</u>: Plaintiff is a member of the Class she seeks to represent. Plaintiff's claims are typical of the claims of each Class member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased the Product. Plaintiff is entitled to relief under the same causes of action as the other Class members.

117.    <u>Adequacy</u>: Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the Class members she seeks to represent; the consumer fraud claims are common to all other members of the Class, and Plaintiff has a strong interest in vindicating the rights of the Class; Plaintiff has retained counsel competent and experienced in complex class action litigation and Plaintiff intends to vigorously prosecute this action. Plaintiff has no interests which conflict with those of the Class. The Class members' interests will be fairly and adequately protected by Plaintiff and proposed Class Counsel. Defendant has acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class members. The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications.

118.    The Class is properly brought and should be maintained as a class action because a class action is superior to traditional litigation of this controversy. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.    The joinder of thousands of individual Class members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.    The individual claims of the Class members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive to justify individual actions;

23

CROSNER LEGAL, P.C.

c.    When Defendant's liability has been adjudicated, all Class members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.    This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.    Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.    This class action will assure uniformity of decisions among Class members;

g.    The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

h.    Class members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by a single class action.

119.    <u>Final Declaratory or Injunctive Relief</u>: Additionally, or in the alternative, the Class also may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class making final declaratory and/or injunctive relief with respect to the members of the Class as a whole, appropriate.

120.    Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent Defendant from engaging in the acts described, and to require Defendant to provide full restitution to Plaintiff and Class members.

121.    Unless the Class is certified, Defendant will retain monies that were taken from Plaintiff and Class members as a result of Defendant's wrongful conduct. Unless a classwide injunction is issued, Defendant will continue to commit the violations alleged and the Class and general public will continue to be misled.

/ / /

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT

CROSNER LEGAL, P.C.

CROSNER LEGAL, P.C.

**FIRST CLAIM FOR RELIEF**

**Violation of California's Consumers Legal Remedies Act**

**Cal. Civ. Code §§ 1750, *et seq.***

***(On Behalf of the California Class)***

122.    Plaintiff realleges and incorporates by reference all allegations contained in this Complaint, as though fully set forth herein.

123.    Plaintiff brings this claim under the CLRA individually and on behalf of the Class against Defendant.

124.    At all times relevant hereto, Plaintiff and the members of the Class were "consumer[s]," as defined in California Civil Code section 1761(d) because they purchased the Product for personal, family, and household purposes.

125.    At all relevant times, Defendant was a "person," as defined in California Civil Code section 1761(c).

126.    At all relevant times, the Product manufactured, marketed, advertised, and sold by Defendant constituted "goods," as defined in California Civil Code section 1761(a).

127.    Purchases of the Product by Plaintiff and Class members were and are "transactions" within the meaning of California Civil Code section 1761(e).

128.    Defendant disseminated, or caused to be disseminated false and misleading representations, through its labeling and advertising of the Product in violation of the CLRA. Defendant's representations that the Product is "Hypoallergenic" and for "Sensitive Skin" and comparable to Dove Sensitive Skin Body Wash, which statements appear on the front label of the Product, are meant to and do convey the impression that the Product is intended for use by those with sensitive skin because it is specifically formulated to minimize the risk of allergic reactions by excluding ingredients that are known to cause an allergic reaction in a significant number of people.  This is false and misleading because the Product contains MCI/MI and CAPB, common allergens. MCI/MI is a common allergen and recognized sensitizer that has reached epidemic proportions in North America affecting almost eleven percent of the population for which exposure to even trace amounts may elicit a positive reaction, including

25

ACD. MI and CAPB were named allergen of the year by the ACDS in 2013 and 2004 respectively. Nor is the Product comparable to Dove Sensitive Skin Body Wash, which does not contain MCI/MI as an ingredient. Defendant knew or should have known that these representations on the front of the Product package would mislead reasonable consumers.

129. These are material misrepresentations and omissions as a reasonable consumer would find the fact that the Product contains ingredients that are common allergens and which is not comparable to Dove Sensitive Skin Body Wash as represented by Defendant, to be material to their decision to purchase the Product. Defendant's representations violate the CLRA in the following ways:

(a) Defendant represented that the Product has characteristics, ingredients, uses, and benefits which it does not have (Cal. Civ. Code § 1770(a)(5));

(b) Defendant represented that the Product is of a particular standard, quality, or grade, which it is not (Cal. Civ. Code § 1770(a)(7));

(c) Defendant advertised the Product with an intent not to sell the Product as advertised (Cal. Civ. Code § 1770(a)(9)); and

(d) Defendant represented that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal. Civ. Code § 1770(a)(16)).

130. Defendant's actions as described herein were done with conscious disregard of Plaintiff's and the Class members' rights and were wanton and malicious.

131. Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA, since Defendant is still representing that the Product has characteristics that it does not have.

132. Pursuant to California Civil Code section 1782(d), Plaintiff and the members of the Class seek an order enjoining Defendant from engaging in the methods, acts, and practices alleged herein.

133. Pursuant to California Civil Code section 1782, on or about February 6, 2025, Plaintiff notified Defendant, in writing, by certified mail, of the alleged violations of the CLRA

and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act. Defendant has not rectified or agreed to rectify the problems associated with the actions detailed herein and give notice to all affected consumers within 30 days of the date of written notice pursuant to section 1782 of the CLRA. Thus, Plaintiff seeks actual damages, injunctive relief, and attorneys' fees and costs for Defendant's violations of the CLRA.

134.    Pursuant to section 1780(d) of the CLRA, below is an affidavit showing this action was commenced in a proper forum.

### SECOND CLAIM FOR RELIEF

**Violation of California's Unfair Competition Law ("UCL")**

**Cal. Bus. & Prof. Code §§ 17200,** *et seq.*

***(On Behalf of the California Class)***

135.    Plaintiff realleges and incorporates by reference all allegations contained in this Complaint, as though fully set forth herein.

136.    Plaintiff brings this claim under the UCL individually and on behalf of the Class against Defendant.

137.    The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising.

138.    Defendant committed unlawful business acts or practices by making the representations and omitting material facts (which constitutes advertising within the meaning of Cal. Bus. & Prof. Code, § 17200), as set forth more fully herein, and by violating California's Consumers Legal Remedies Act, Cal. Civ. Code §§17500, *et seq.*, California's False Advertising Law, Cal. Bus. & Prof. §§ 17500, *et seq.*, 15 U.S.C. § 45, and by breaching express warranties. Plaintiff, individually and on behalf of the other Class members, reserves the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

139.    Defendant committed "unfair" business acts or practices by: (1) engaging in conduct where the utility of such conduct is outweighed by the harm to Plaintiff and the

CROSNER LEGAL. P.C.

members of the Class; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and the members of the Class; and (3) engaging in conduct that undermines or violates the intent of the consumer protection laws alleged herein. There is no societal benefit from deceptive advertising. Plaintiff and the other Class members paid for a Product that is not as advertised by Defendant. While Plaintiff and the other Class members were harmed, Defendant was unjustly enriched by its false misrepresentations and material omissions. As a result, Defendant's conduct is "unfair," as it offended an established public policy. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

140.    Defendant committed "fraudulent" business acts or practices by making the representations of material fact regarding the Product as set forth herein. Defendant's business practices as alleged are "fraudulent" under the UCL because they are likely to deceive customers into believing the Product is hypoallergenic and formulated for sensitive skin and comparable to Dove Sensitive Skin Body Wash.

141.    Defendants knowingly and intentionally represented that the Product is "Hypoallergenic" and for "Sensitive Skin" and comparable to Dove Sensitive Skin Body Wash which, as described herein, is false and misleading.

142.    Defendant also made a material false representation and omission by failing to disclose the truth about the Product, including that the Product is not "Hypoallergenic" or for "Sensitive Skin" or comparable to Dove Sensitive Skin Body Wash because it contains MCI/MI, a highly allergenic chemical to which eleven percent of the population has been sensitized, which scientists consider to be an epidemic level, and which the FDA identifies as a common allergen, for which trace amounts may elicit an allergic reaction (such as ACD), and which is not contained in Dove Sensitive Skin Body Wash. It also contains CAPB another common allergen.

143.    Plaintiff and the other members of the Class have been deceived as a result of their reliance on Defendant's material representations and omissions. This reliance has caused harm to Plaintiff and the other members of the Class, each of whom purchased Defendant's

Product. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of purchasing the Product and Defendant's unlawful, unfair, and fraudulent practices.

144.    Defendant's wrongful business practices and violations of the UCL are ongoing.

145.    Plaintiff and the Class seek pre-judgment interest as a direct and proximate result of Defendant's unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the Class seek interest in an amount according to proof.

146.    Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate. Pursuant to California Business & Professions Code § 17203, Plaintiff, individually and on behalf of the Class, seeks (1) restitution from Defendant of all money obtained from Plaintiff and the other Class members as a result of unfair competition; (2) an injunction prohibiting Defendant from continuing such practices in the State of California that do not comply with California law; and (3) all other relief this Court deems appropriate, consistent with California Business & Professions Code section 17203.

### THIRD CLAIM FOR RELIEF

### Breach of Express Warranty

### (On Behalf of the California Class and Multi-State Class)

147.    Plaintiff realleges and incorporates by reference all allegations contained in this Complaint, as though fully set forth herein.

148.    Plaintiff brings this claim for breach of express warranty individually and on behalf of the Classes against Defendant.

149.    As the manufacturer, marketer, distributor, and seller of the Product, Defendant issued an express warranty by representing to consumers at the point of purchase, on the front of the Product package, that the Product is "Hypoallergenic" and formulated for "Sensitive Skin" and comparable to Dove Sensitive Skin Body Wash.

150.    Plaintiff and the Class reasonably relied on Defendant's above misrepresentations, descriptions and specifications regarding the Product.

CROSNER LEGAL. P.C.

29

CROSNER LEGAL, P.C.

151.    Defendant's representations were part of the description of this good and the bargain upon which the good was offered for sale and purchased by Plaintiff and members of the Class.

152.    In fact, the Product does not conform to Defendant's representations because the Product contains MCI/MI, a highly allergenic chemical to which eleven percent of the population has been sensitized, which scientists consider to be an epidemic level, and which the FDA identifies as a common allergen and which is not an ingredient in the Dove Sensitive Skin Body Wash. It also contains CAPB, another common allergen. By falsely representing that the Product as "Hypoallergenic" and formulated for "Sensitive Skin" and comparable to Dove Sensitive Skin Body Wash, Defendant breached express warranties.

153.    Plaintiff relied on Defendant's (the manufacturer) representations on the Product's label which provides the basis for an express warranty.

154.    As a direct and proximate result of Defendant's breach, Plaintiff and members of the Class were injured because they: (1) paid money for the  Product that was not what Defendant represented; (2) were deprived of the benefit of the bargain because the  Product they purchased was different than Defendant advertised; and (3) were deprived of the benefit of the bargain because the Product they purchased had less value than if Defendant's representation about the characteristics of the Product was truthful.

155.    Had Defendant not breached the express warranty by making the false representations alleged herein, Plaintiff and Class members would not have purchased the Product or would not have paid as much as they did for the Product.

156.    All conditions precedent to Defendant's liability under the above-referenced contract have been performed by Plaintiff and the other Class members. Defendant breached its express warranties about the Products, as alleged above. Defendant violated the following state warranty laws, which are substantially similar to California express warranty law: Alaska Stat. § 45.02.313; A.R.S. § 47-2313; Ark. Code § 4-2-313; Cal. Com. Code § 2313; Colo. Rev. Stat. § 4-2-313; Conn. Gen. Stat. § 42a-2-313; 6 Del. C. § 2-313; D.C. Code § 28:2-313; Ga.

CLASS ACTION COMPLAINT

Code § 11-2-313; HRS § 490:2- 313; Idaho Code § 28-2-313; 810 ILCS 5/2-313; Ind. Code §

26-1-2-313; K.S.A. § 84-2-313; KRS § 355.2-313; 11 M.R.S. § 2-313; Mass. Gen. Laws Ann.

ch. 106 § 2-313; Minn. Stat. § 336.2-313; Miss. Code Ann. § 75-2-313; R.S. Mo. § 400.2-313;

Mont. Code Anno. § 30-2-313; Neb. Rev. Stat. § 2- 313; Nev. Rev. Stat. Ann. § 104.2313; RSA

382-A:2-313; N.J. Stat. Ann. § 12A:2-313; N.M. Stat. Ann. § 55-2-313; N.Y. U.C.C. Law § 2-

313; N.C. Gen. Stat. § 25-2-313; N.D. Cent. Code § 41-02-30; ORC Ann. § 1302.26; 12A Okl.

St. § 2-313; Or. Rev. Stat. § 72-3130; 13 Pa. C.S. § 2313; R.I. Gen. Laws § 6A-2-313; S.C.

Code Ann. § 36-2-313; S.D. Codified Laws, § 57A-2-313; Tenn. Code Ann. § 47-2-313; Tex.

Bus. & Com. Code § 2.313; Utah Code Ann. § 70A-2-313; 9A V.S.A. § 2-313; Va. Code Ann.

§ 59.1-504.2; Wash. Rev. Code Ann. § 62A.2-313; W. Va. Code § 46- 2-313; and Wyo. Stat.

§ 34.1-2-31.

## PRAYER FOR RELIEF

Plaintiff, individually, and on behalf of all others similarly situated, requests relief

pursuant to each claim set forth in this Complaint, as follows:

a.      Declaring this action is a proper class action, certifying the Class as requested

herein, designating Plaintiff as the class representative and appointing undersigned counsel as

class counsel;

b.      Ordering restitution and disgorgement of all profits and unjust enrichment that

Defendant obtained from Plaintiff and Class members as a result of Defendant's unlawful,

unfair, and fraudulent business practices;

c.      Ordering injunctive relief as permitted by law or equity, including enjoining

Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to

engage in a corrective advertising campaign;

d.      Ordering damages in an amount which is different than that calculated for

restitution for Plaintiff and the Class, including compensatory, statutory and punitive damages;

e.      For an order declaring that Defendant's conduct violates the statutes referenced

herein;

CROSNER LEGAL, P.C.

1      f.      Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the

2  other members of the Class;

3      g.      Ordering Defendant to pay both pre- and post-judgment interest on any amounts

4  awarded; and

5      h.      Ordering such other and further relief as may be just and proper.

6  **JURY DEMAND**

7      Plaintiff hereby demands a trial by jury of all claims in this Complaint so triable.

8

9  Dated: August 29, 2025             CROSNER LEGAL, P.C.

10                        By:    */s/ Jennifer L. MacPherson*

11                           JENNNIFER L. MACPHERSON

12                        Jennifer L. MacPherson (SBN 202021)

13                        *jmacpherson@crosnerlegal.com*

Craig W. Straub (SBN 249032)

14                        *craig@crosnerlegal.com*

Zachary M. Crosner (SBN 272295)

15                        *zach@crosnerlegal.com*

9440 Santa Monica Blvd. Suite 301

16                        Beverly Hills, CA 90210

Tel: (866) 276-7637

17                        Fax: (310) 510-6429

18                        *Attorneys for Plaintiff and the Proposed Class*

19

20

21

22

23

24

25

26

27

28

32

CROSNER LEGAL, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>Civil Code Section 1780(d) Affidavit</u>

I am an attorney duly licensed to practice before all courts of the State of California. I am one of the counsel of record for Plaintiff. This declaration is made pursuant to § 1780(d) of the California Consumers Legal Remedies Act. Defendant has done, and is doing, business in California, including in this District. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed August 29, 2025 at Carlsbad, California.

By:    */s/ Jennifer L. MacPherson*
JENNNIFER L. MACPHERSON

33

CLASS ACTION COMPLAINT